UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZUBIN NAGPAL,<br><br>*Plaintiff*,<br><br>-against-<br><br>BIMM, LLC d/b/a Jean's, CGM-LLNR, LLC, d/b/a Jean's, ASHWIN DESHMUKH, MAX CHODOROW, ZACHARY CHODOROW, and JEFFREY CHODOROW,<br><br>*Defendants*. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff ZUBIN NAGPAL ("**Plaintiff**"), by his attorneys McCue Sussmane Zapfel & Cohen P.C., alleges as follows as and for his complaint against the captioned defendants (collectively "**Defendants**") including CGM-LLNR, LLC ("**CGM**" or "**Holding Company**"), BIMM, LLC ("**BIMM**" or "**Member**"), ASHWIN DESHMUKH ("**Defendant AD**"), MAX CHODOROW ("**Defendant MC**"), ZACHARY CHODOROW ("**Defendant ZC**"), and JEFFREY CHODOROW ("**Defendant JC**" and, together with Defendant AD, Defendant MC and Defendant ZC, referred to collectively as "**Defendant Operators**").

## NATURE OF ACTION

1. This Action is commenced by Plaintiff against the owners and operators of an acclaimed and high-profile club / restaurant known as Jean's (the "**Defendant Business**") in downtown New York City which induced Plaintiff to invest a sum of $100,000 in 2019 to open the establishment and has since discontinued communications with Plaintiff without ever providing any meaningful financial disclosures accounting for the assets, income and/or liabilities of the business, nor ever paid a single dollar to Plaintiff despite the Defendant Business continuing to operate today.

2. As further detailed below, with the investment funds from Plaintiff in 2019, Defendants in fact established and opened the Defendant Business at its first location at 415 Lafayette Street, New York, New York (the "**NY Location**") and have not only successfully operated the business there for years but have now expanded the business to new locations including one opening in the Hamptons at 3516 Montauk Highway, Sagaponack, New York (the "**Hamptons Location**") – all to the exclusion of Plaintiff in violation of his contractual rights under his agreements with Defendants but also his legal rights as an interest holder under New York law.

3. By this Action, Plaintiff seeks to enforce its rights and pursue relief from Defendants in connection with their "freeze out" of Plaintiff as a minority investor and interest holder as well as their other wrongdoing further detailed below with claims against them including breach of contract, breach of fiduciary duty, accounting, inspection of books and records, and other related claims as necessary to compensate Plaintiff for the resulting damages as well and to otherwise enforce his rights against them as interest holder in the business.

## PARTIES

4. Plaintiff is an individual who currently resides in Austin, Texas, and is presently a citizen of the State of Texas.

5. Upon information and belief, Defendant CGM is a New York limited liability company registered to do business in New York which holds and operates the Defendant Business, with its principal place of business located at 415 Lafayette Street, New York, New York. Upon information and belief, no member of Defendant CGM is a citizen of the State of Texas.

6. Upon information and belief, Defendant BIMM is a Delaware limited liability company doing business in New York which holds a 50 percent membership interest in Defendant CGM, with its principal place of business located at 415 Lafayette Street, New York, New York.

Upon information and belief, the members of record of Defendant BIMM are Defendant AD and non-party Laura Mueller-Soppart, each of whom is domiciled in and a citizen of the State of New York, and no member of record of Defendant BIMM is a citizen of the State of Texas. Although Plaintiff acquired and holds the Equity Interest defined below, Defendants have never admitted Plaintiff as a member of record of Defendant BIMM, issued or recorded any units of Defendant BIMM to him, or placed him on any capitalization table of Defendant BIMM, and Plaintiff is not a member of record of Defendant BIMM.

7. Upon information and belief, Defendant AD is a natural person domiciled in New York and a citizen of the State of New York, with a place of business located at 415 Lafayette Street, New York, New York.

8. Upon information and belief, Defendant MC is a natural person with a place of business located at 415 Lafayette Street, New York, New York, who is domiciled in and a citizen of either the State of New York or the Commonwealth of Pennsylvania and, in any event, is not a citizen of the State of Texas.

9. Upon information and belief, Defendant ZC is a natural person with a place of business located at 415 Lafayette Street, New York, New York, who is domiciled in and a citizen of either the State of Florida or the State of New York and, in any event, is not a citizen of the State of Texas.

10. Upon information and belief, Defendant JC is a natural person domiciled in Miami, Florida, and a citizen of the State of Florida, with a place of business located at 415 Lafayette Street, New York, New York.

**JURISDICTION AND VENUE**

11. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties – Plaintiff is presently a citizen of Texas;

Defendant AD is a citizen of New York; Defendant MC is a citizen of either New York or Pennsylvania; Defendant ZC is a citizen of either Florida or New York; Defendant JC is a citizen of Florida; Defendant BIMM and Defendant CGM are limited liability companies no member of which is a citizen of Texas; and no Defendant is a citizen of the State of Texas – and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, in that Plaintiff seeks, *inter alia*, damages corresponding to his investment of $100,000 and his share of amounts wrongfully withheld and diverted from the Defendant Business. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the solicitation of the investment of Plaintiff and the operation of the Defendant Business at the NY Location.

## STATEMENT OF FACTS

12. As detailed below, Plaintiff has commenced this Action against the defendants in connection with a transaction which they induced Plaintiff to enter into in 2019 (the "**Transaction**") under which he invested a sum of $100,000 (the "**Principal Amount**") in the Defendant Business, then found himself frozen out by the owners and operators after the business had opened, and have now discontinued communications without ever delivering a dollar to him despite the continuation of the business today.

### I. The Relationship Between the Parties

13. Plaintiff is a business person and investor with a professional and personal relationship with Defendant AD that began in or around 2018 and which resulted in two (2) investments with Defendant AD and his affiliates including the investment in the Defendant Business that is the subject matter of this Action.

14. During all relevant periods, Defendant AD has held himself out to Plaintiff and the public as a local restaurant and nightlife impresario who manages and owns several successful

restaurant businesses in New York City including Williamsburg Pizza, Superiority Burger, and the Defendant Business which is the subject matter of this Action.

15. According to the representations of Defendant AD and the other defendants to Plaintiff, the Defendant Business was founded and has at all times been operated by himself, together with his partner, non-party Laura Mueller-Soppart, as well as famed restauranteur, Defendant JC, and his sons, Defendant MC and Defendant ZC, with managerial control over and involvement in all aspects of the Defendant Business shared by Defendant Operators.

16. According to the representations of Defendant AD and the other defendants to Plaintiff, the Defendant Business is held by Defendant CGM – an entity formed and controlled by Defendant JC through which JC previously operated a location of his well-known restaurant brand "Asia De Cuba" at the NY Location where the Defendant Business now operates.

17. According to the representations of Defendant AD and the other defendants, the Defendant Business being held by Defendant CGM as a technicality, enabling the Defendant Business to continue to operate at the NY Location under the existing lease and operating licenses of the predecessor business.

18. According to the representations of Defendant AD and the other defendants, Defendant BIMM held a 50% stake in Defendant CGM and was the vehicle by which Defendant AD and Mueller-Soppart held their interest in the Defendant Business.

19. According to the representations of Defendant AD and the other defendants, Defendant MC, Defendant ZC and Defendant JC held their ownership interest in the Defendant Business through a direct interest in Defendant CGM which was formed by Defendant JC.

## II. <u>The Inducement of Plaintiff to Enter into the Transaction with Defendants</u>

20. In the middle of 2019, Defendant AD approached Plaintiff on behalf of himself and the other Defendants and solicited him to invest in the Defendant Business under the Transaction.

21. Pursuant to the Transaction proposed by Defendant AD, Plaintiff would deliver the Principal Amount of $100,000 to Defendants in exchange for an ownership interest in the Defendant Business which Defendants would deliver through an equity interest of 2% in Defendant BIMM (the "**Equity Interest**") which held a 50% ownership interest in Defendant CGM and through which the Defendant Business operated.

22. At the time, Defendant AD represented to Plaintiff that the ownership structure of the Defendant Business – under which Defendant CGM acting as the holding company through which the business operated together with BIMM – was a technicality necessitated by the fact that Defendant JC had previously operated another restaurant brand at the NY Location through Defendant CGM which held the lease and operating licenses (primarily a liquor license) to conduct the Defendant Business at the NY Location.

23. In this context, Defendant AD made various other representations to Plaintiff about the Defendant Business, its corporate structure, characteristics, management, and projected performance to induce Plaintiff to enter into the Transaction including, *inter alia*: (i) that the capital raise for the Defendant Business totaled $2.5 million at a $5 million valuation, as confirmed in the parties' written diligence correspondence; (ii) that Defendant AD and Mueller-Soppart would draw a management fee of roughly 3% of the revenues of the Defendant Business together with a 20% profit participation, likewise reflected in that correspondence; and (iii) that the Defendant Business would be a high-profile, high-revenue venue in the mold of Defendant JC's prior successes at the NY Location, and that investors would receive regular financial reporting and distributions as the business became profitable.

24. In this context, Defendants other than Defendant AD made similar representations to Plaintiff to induce him to enter into the Transaction in communications including telephone calls and emails, including communications from and copying non-party Laura Mueller-Soppart during

the diligence period in the spring of 2019 confirming the structure of the investment, the classes of membership units offered, and the operating terms of the Defendant Business.

25. In addition, and to induce Plaintiff to invest, Defendant MC and Defendant ZC represented to Plaintiff, by telephone and in text messages, that Plaintiff would be provided with direct login credentials to the point-of-sale and reporting system used by the Defendant Business (which Plaintiff understood to be the system marketed as Restaurant365) so that he could monitor the performance of the business, and that he would be afforded rights to audit and to inspect the books and records of the Defendant Business. No such credentials, audit rights or inspection rights were ever provided.

26. In the course of his diligence, by written correspondence dated June 6, 2019 addressed to Defendant AD and copying non-party Laura Mueller-Soppart, Plaintiff expressly inquired regarding, *inter alia*, the fundraising schedule and the check sizes of the other investors, the classes of membership units offered, the management fee and profit participation of Defendant AD and Mueller-Soppart, and the need for investor transparency – including required investor meetings "to give the investors opportunity to ask questions about the business and ensure we maintain transparency" – and Defendants accepted Plaintiff's investment on that basis without qualifying or correcting the terms so confirmed.

27. In reliance upon these and other representations made by Defendant AD and the other Defendants, Plaintiff agreed to enter into the Transaction and delivered the Principal Amount to Defendants in two installments in or about August and September of 2019, an initial disbursement of $25,000 on or about August 15, 2019 and the balance on or about September 18, 2019, which funds were, upon information and belief, received into a bank account in the name of Defendant BIMM. In exchange, Plaintiff acquired the Equity Interest, which Defendants undertook to reflect in Class B Units of Defendant BIMM issued at the rate of one percent (1%)

for each $50,000 of capital contributed, and to document by admitting Plaintiff as a member of record of Defendant BIMM.

28. In connection with the Transaction, by email dated May 18, 2019, Defendant AD and the other Defendant Operators delivered an unsigned operating agreement for BIMM dated August 1, 2018 (the "**BIMM Operating Agreement**") together with unsigned signature pages, and separately provided a subscription booklet for Class B Units of BIMM under which Class B Units were to be issued at the rate of one percent (1%) for each $50,000 of capital contributed, which Defendant AD represented to Plaintiff as the operative documents containing factual recitals and rights for the benefit of members which Plaintiff could and did rely upon in making the investment.

29. Relevant recitals of facts and rights contained in the BIMM Operating Agreement include, *inter alia*: (i) the identification of Defendant AD and non-party Laura Mueller-Soppart as managers of BIMM [*see, e.g.,* BIMM Op. Ag., pp. 1 and 4]; (ii) identification of CGM and BIMM as operators of the Defendant Business [*see, e.g., id*., p. 1 and § 2.2(a)]; (iii) distribution obligations [*see, e.g., id.,* § 3.7]; and (iv) obligations of the managers of BIMM to maintain books and records for the business [*id*., § 7.1].

30. In connection with the Transaction, Defendant AD himself and on behalf of Defendant BIMM and the Defendant Business agreed to provide Plaintiff with, *inter alia*: (i) admission as a member of Defendant BIMM in respect of the Equity Interest; (ii) documentation of the Equity Interest, including subscription documentation and a capitalization table; (iii) periodic financial disclosures with respect to the Defendant Business; and (iv) distributions in accordance with the distribution provisions of the BIMM Operating Agreement [*see id*., § 3.7].

## III. The Wrongdoing of Defendants After Plaintiff Entered into the Transaction

31. In reliance upon the representations and disclosures of Defendant AD and the other

Defendants, in or around June of 2019, Plaintiff agreed to enter into the Transaction and thereafter delivered the Principal Amount to Defendants in the installments described above in exchange for an interest in the Defendant Business as reflected in, *inter alia*, the Equity Interest in Defendant BIMM.

32. After entering into the Transaction, Plaintiff received a handful of communications from Defendant AD regarding the Defendant Business and its build-out of the NY Location which included, *inter alia*, periodic informal updates regarding the progress of construction and buildout at the NY Location, the anticipated opening timeline, and the status of the lease, liquor license and related approvals for the Defendant Business.

33. The opening of the Defendant Business was delayed by the COVID-19 pandemic. On or about September 3, 2020, Defendant AD led a telephone conference with the investors in the Defendant Business, at which Plaintiff and other investors requested financial disclosures and received instead a general account of the negotiation of a rent moratorium with the landlord and of hiring. No financial disclosures followed.

34. On or about October 10, 2023, the Defendant Business opened at the NY Location to much media attention and has since remained an open and outwardly-thriving restaurant and bar business for which reservations are consistently unavailable online – indeed, Defendant Operators themselves have touted that Vogue called the Defendant Business “the hardest reservation in New York”.

35. Throughout this period Defendants continued to treat and to acknowledge Plaintiff as an owner of an interest in the Defendant Business, including by hosting Plaintiff and his wife at the Defendant Business on multiple occasions, among them on or about April 27, 2023.

36. Since opening in 2023, neither Defendant AD nor the other Defendants has ever provided Plaintiff with either any meaningful financial disclosures (or distributions) with respect

to the Defendant Business or BIMM despite ongoing inquiries and demands by Plaintiff.

37. To date, the only disclosure that Plaintiff has ever received from any of Defendants with respect to the operations of the Defendant Business was an email dated February 25, 2024 sent by Defendant AD, signed jointly by Defendant AD and Defendant MC, and copying Defendant JC, addressed generally to "Jean's Investors" and received by Plaintiff (the "**2024 Email**").

38. The 2024 Email did not provide any meaningful disclosures to investors regarding the Defendant Business or their investments. It did little more than announce that the restaurant had reached profitability, relay general expectations of imminent future growth, affirm that Defendant AD continued to operate the Defendant Business in "partnership" with the "Chodorow family," and promise more substantive disclosures in the future.

39. To give the appearance of substance, the 2024 Email attached a document identified as a "financial statement" and "Jean's Adjusted Profit and Loss Oct-Nov-Dec 2023" (the "**2024 Statement**") but this document reflected only a few months of purported operating results for the Defendant Business at the NY Location at the very end of 2023 – without any disclosures about the broader capitalization, income, assets and/or liabilities of the Defendant Business or its corporate owners.

40. Further, statements made by Defendant Operators in the 2024 Email to introduce the 2024 Statement only served to underscore its deficiencies for purposes of an investor – warning the statement "may be a bit confusing" – then vaguely referencing, *inter alia*:

a. a litany of unspecified liabilities to which income of the Defendant Business had been and/or would be applied such as unspecified deferred "rent amounts" and "management fees" purportedly owed to Defendant Operators as well as their affiliates;

b. mistakes in billing of unspecified obligations of the Defendant Business resulting in additional unexplained accounting irregularities; planned allocation of unspecified "additional losses"

to certain investors for unspecified obligations accrued prior to October of 2023 in connection with unspecified "ongoing business" activities;

c. the absence of a defined capitalization table for investors in the Defendant Business and potential plans to raise additional capital; and

d. a range of other undefined issues affecting investors, their interests and rights as interest holders in the Defendant Business.

41. In fact, the 2024 Statement reflects on its face that Defendant Operators had engaged in significant manipulation of the reported results of the Defendant Business: among other things, approximately $176,462.90 of expenses were reallocated out of the reported quarter into periods never disclosed to investors, and the "profitability" touted in the 2024 Email for December 2023 was entirely an artifact of such reallocations – the actual operating result of the Defendant Business for that month being a loss of approximately $51,694.66, and the actual aggregate operating result for the quarter being a loss of approximately $311,834.37 rather than the adjusted loss of $135,371.47 presented in the 2024 Statement.

42. The 2024 Email further disclosed that Defendant Operators had accrued to themselves and their affiliates – including a restaurant management company owned by the family of Defendant JC – management fees of at least $84,943.25 for the reported quarter alone, together with additional unquantified and unbilled fees for periods prior to October 2023, all while paying no distributions to Plaintiff and withholding all meaningful financial disclosures from Plaintiff and the other investors.

43. The 2024 Email likewise stated that additional losses would be allocated to investors who – like Plaintiff – invested before October 2023, and conceded that no finalized capitalization table for investors existed, stating that Defendant Operators were still "finalizing the cap table for all investors (pre - 2020 and post)."

44. The 2024 Email also confirmed the complete dominion and control of Defendant

Operators over the Defendant Business and its finances, stating that "[t]he Chodorow family business, CGM, holds the bag on all matter financial controls, controls the bank accounts, payables, HR and legal."

45. Thereafter, and notwithstanding repeated demands, the only further information Defendants provided concerning the Defendant Business was furnished informally and outside of any financial reporting. On or about August 5, 2024, Defendant AD advised Plaintiff that revenue at the Defendant Business had been "down big in June and July," that the business was then operating at approximately $150,000 per week against a goal of $220,000 per week, that approximately $250,000 of investment had been left open following the most recent closing, that total capital raised since 2020 was approximately $1.2 million, and that the Defendant Business projected topline revenue of $8.5 to $9.5 million over the following twelve months – while at the same time stating that Defendants "[s]hould have a cap table in August", five years after Plaintiff's investment.

46. After receipt of the 2024 Email, Plaintiff repeatedly reached out to Defendant AD and the other Defendant Operators with questions and demands for more substantive disclosures regarding the Defendant Business and his interests therein in the months that followed.

47. Initially, Defendant AD responded to the inquiries of Plaintiff with representations that his requests had been relayed to the Chodorows along with those other investors and that Defendant Operators were preparing more substantive disclosures establishing the capitalization, assets, liabilities and income of the Defendant Business (and BIMM) in more detail.

48. However, neither Defendant AD nor the other Defendants delivered any further disclosures to Plaintiff as promised and ultimately Defendants stopped responding to Plaintiff entirely in the latter half of 2024, and have continued to withhold all disclosures, distributions and access to books and records from Plaintiff from that time through the present.

49. These events coincided with similar misconduct by Defendant AD in connection with another transaction with Plaintiff under which he obtained a loan from Plaintiff for another restaurant venture, called "Superiority Burger", then defaulted on the loan and ultimately terminated communications with Plaintiff.

50. Plaintiff later discovered that news reports and litigation against Defendant AD and the company through which this venture operated indicated that Defendant AD had been accused of financial wrongdoing in connection with the venture that included "serial scamming" of investors/lenders under circumstances substantially similar to those experienced by Plaintiff.[1]

51. This wrongdoing against Plaintiff is the subject matter of a separate, related action commenced by Plaintiff against Defendant AD and his affiliate company contemporaneously with this action in federal court in the Southern District of New York.

52. Unfortunately, Plaintiff's experience in this Transaction with Defendant AD and the other Defendants appears to be a simple continuation of the intentional misconduct that Plaintiff and the other aggrieved investors and creditors of Superiority Burger experienced in connection with that transaction.

53. Very simply, Defendant AD and the other Defendant Operators have exploited their dominion and control of the Defendant Business and the constituent companies through which it operates to freeze out Plaintiff, disregard their fiduciary duties to him as an investor (and other legal and contractual duties), and walk away with his investment.

54. The refusal of Defendants to provide any disclosures or access to basic information

---

[1] News reports on these activities by Defendant are readily available online and include articles from the New York Times and Eater. *See, e.g.*, https://www.nytimes.com/2024/03/14/style/superiority-burger-ashwin-deshmukh.html and https://ny.eater.com/2024/3/15/24101756/ashwin-deshmukh-superiority-burger-jeans-scam. For example, litigations commenced against Defendant AD and his affiliates in connection with "Superiority Burger" included one by an individual named June Kwan in New York Supreme Court in early 2024 which indicated that she had been induced to enter into a lending transaction similar to that of Plaintiff with in and after 2021 under substantially similar pretenses to those of the transaction with Plaintiff – under which they had failed to deliver either payment or promised equity in the company.

with respect to the investment of Plaintiff is itself significant misconduct to the direct and foreseeable detriment of Plaintiff and conducted in an apparent attempt to conceal further misconduct in operation of the Defendant Business to the detriment of Plaintiff and the other investors.

55. The wrongdoing of Defendants detailed above is continuing in nature: the obligations of Defendants to provide financial disclosures, access to books and records, capitalization documentation and distributions to Plaintiff are ongoing and recurring obligations, and each successive refusal of Defendants to honor them constitutes a new and independent breach of their contractual and fiduciary obligations to Plaintiff, continuing without interruption through the date of this Complaint.

56. Further, by withholding all meaningful financial disclosures from Plaintiff while repeatedly representing that substantive disclosures, capitalization tables and other documentation of his interests were forthcoming, Defendants concealed from Plaintiff the facts underlying his claims and induced him to forbear from asserting them, and Plaintiff reasonably relied upon those representations in so forbearing. By reason of this conduct, Defendants are equitably estopped from asserting any defense based upon the passage of time, and the running of any applicable limitations period was tolled during the period of such concealment and inducement.

**FIRST COUNT**
**Breach of Contract**
**(Defendant BIMM and Defendant AD)**

57. Plaintiff realleges each of the foregoing paragraphs of the Complaint.

58. As detailed above, Plaintiff entered into the Transaction under which Plaintiff performed all obligations including contribution of the Principal Amount in exchange for consideration that included his interest in the Defendant Business reflected in, *inter alia*, the Equity

Interest in Defendant BIMM which operates the Defendant Business in partnership with Defendant CGM.

59. As detailed above, in connection with the Transaction, Plaintiff entered into an agreement with Defendant BIMM as well as Defendant AD as a manager of BIMM with contractual and fiduciary obligations to its members; in the alternative, to the extent the BIMM Operating Agreement is determined never to have been executed or made effective, Plaintiff's agreement was made with Defendant AD individually, who solicited Plaintiff's investment, accepted the Principal Amount, and promised the consideration to be delivered to Plaintiff under the Transaction.

60. As detailed above, Plaintiff entered into the Transaction with terms that included, *inter alia*: (i) admission of Plaintiff as a member of record of BIMM in respect of the Equity Interest, with the rights of a holder of Class B Units under the BIMM Operating Agreement; (ii) rights to distributions in accordance with the distribution provisions of the BIMM Operating Agreement; (iii) rights to financial disclosures and access to the books and records of BIMM; and (iv) rights to documentation of the Equity Interest, including subscription documentation and a capitalization table.

61. As detailed above, under the direction and control of Defendant AD, BIMM has breached and continues to breach its obligations to Plaintiff by, *inter alia*: (i) failing to maintain books and records as required; (ii) failing to provide disclosures to Plaintiff as required as member; (iii) upon information and belief, failing to provide required distributions; (iv) failing to document Plaintiff's Equity Interest, including by failing to maintain or provide any capitalization table; (v) upon information and belief, permitting funds of the Defendant Business to be diverted to Defendant Operators and their affiliates in the form of management fees and other insider payments while withholding distributions and disclosures from Plaintiff; and (vi) failing to admit

Plaintiff as a member of record of BIMM in respect of the Equity Interest. Each of the foregoing breaches has continued through the present.

62. As a direct and proximate result of the aforementioned misconduct, Plaintiff has been damaged.

63. By reason of the foregoing, Defendant BIMM along with Defendant AD are liable to Plaintiff in an amount to be determined at trial but not less than $100,000, together with applicable interest, fees and costs including reasonable attorneys' fees to the extent applicable.

**SECOND COUNT**
**Breach of Fiduciary Duty**
**(Defendant Operators)**

64. Plaintiff realleges each of the foregoing paragraphs of the Complaint.

65. As detailed above, Plaintiff entered into the Transaction under which he obtained an interest in the Defendant Business reflected in, *inter alia*, the Equity Interest in Defendant BIMM which operates the Defendant Business in partnership with Defendant CGM.

66. As detailed above, the Defendant Business operated through Defendant BIMM in conjunction with Defendant CGM with the former managed by Defendant AD and non-party Laura Mueller-Soppart and the latter managed by Defendant JC and Defendant MC as managing members.

67. Accordingly, during all relevant periods, the Defendant Business has been operated by Defendant Operators themselves with complete dominion and control over the constituent companies through which the Defendant Business operates.

68. In this capacity, Defendant Operators have a fiduciary duty of loyalty, good faith and fair dealing to the investors in the Defendant Business and members of the constituent companies through which it operates including Defendant CGM and Defendant BIMM.

69. In addition, by virtue of the ownership interest held by Defendant BIMM in Defendant CGM, as managing members of Defendant CGM, Defendant JC and Defendant MC have a fiduciary duty of loyalty, good faith and fair dealing to Defendant BIMM as member along with Defendant CGM.

70. Accordingly, each of Defendant Operators owes a fiduciary duty to Plaintiff by virtue of his interest in the Defendant Business reflected in, *inter alia*, the Equity Interest in Defendant BIMM – whether or not Defendants have admitted him as a member of record – and by virtue of their dominion and control over the business in which Plaintiff invested, the funds he contributed to it, and the information concerning his investment to which only they have access.

71. As detailed further above, each of Defendant Operators has breached these fiduciary obligations by, *inter alia*: (i) freezing out Plaintiff as investor in the Defendant Business and member of Defendant BIMM and refusing to respond to inquiries and demands; (ii) failing to allow access to books and records with respect to the Defendant Business and/or Defendant BIMM despite inquiries and demands of Plaintiff; (iii) failing to provide capitalization tables and other basic disclosures with respect to the Defendant Business and Defendant BIMM; (iv) upon information and belief, failing to provide distributions to Plaintiff and/or improperly diverting proceeds of the Defendant Business for their own personal purposes; (v) manipulating the reported financial results of the Defendant Business, including by reallocating expenses among reporting periods to tout purported "profitability" while allocating undisclosed losses to early investors including Plaintiff; (vi) accruing management fees and other insider payments to themselves and their affiliates – including at least $84,943.25 for the final quarter of 2023 alone – while paying no distributions to Plaintiff; (vii) upon information and belief, diverting resources and opportunities of the Defendant Business, including its expansion to the Hamptons Location, to or through entities in which Plaintiff holds no interest; and (viii) refusing to provide Plaintiff with the login access to

the point-of-sale and reporting system of the Defendant Business, and the audit and inspection rights, that Defendant MC and Defendant ZC promised him to induce his investment.

72. Each of the foregoing breaches of fiduciary duty is continuing in nature and has continued through the date of this Complaint.

73. Further, each of Defendant Operators has acted together in conjunction with one another and aided and abetted in the aforementioned violations of their fiduciary duties to Plaintiff for their own personal benefits.

74. Further, each of Defendant Operators has exploited their complete dominion and control over Defendant BIMM and Defendant CGM and utilized the companies as instruments to further pursue this misconduct against Plaintiff.

75. By virtue of the aforementioned misconduct, Plaintiff has been damaged.

76. By reason of the foregoing, Defendant Operators are liable to Plaintiff in an amount to be determined at trial together with applicable interest, fees and costs including reasonable attorneys' fees to the extent applicable.

## THIRD COUNT
**Demand for Accounting**
**(Defendants)**

77. Plaintiff realleges each of the foregoing paragraphs of the Complaint.

78. As detailed above, Plaintiff entered into the Transaction under which he obtained an interest in the Defendant Business reflected in, *inter alia*, the Equity Interest in Defendant BIMM which operates the Defendant Business in partnership with Defendant CGM.

79. As detailed above, the Defendant Business operated through Defendant BIMM in conjunction with Defendant CGM with the former managed by Defendant AD and non-party Laura

Mueller-Soppart and the latter managed by Defendant JC and Defendant MC as managing members.

80. Accordingly, during all relevant periods, the Defendant Business has been operated by Defendant Operators themselves with complete dominion and control over the constituent companies through which the Defendant Business operates.

81. In this capacity, Defendant Operators have a fiduciary duty of loyalty, good faith and fair dealing to the investors in the Defendant Business and members of the constituent companies through which it operates including Defendant CGM and Defendant BIMM.

82. In addition, by virtue of the ownership interest held by Defendant BIMM in Defendant CGM, as managing members of Defendant CGM, Defendant JC and Defendant MC have a fiduciary duty of loyalty, good faith and fair dealing to Defendant BIMM as member along with Defendant CGM.

83. Accordingly, Defendant Operators owe a fiduciary duty to Plaintiff by virtue of his interest in the Defendant Business reflected in, *inter alia*, the Equity Interest in Defendant BIMM – whether or not Defendants have admitted him as a member of record – and Defendant BIMM and Defendant CGM hold the books and records of the Defendant Business in which that interest subsists.

84. As detailed further above, Defendants have breached these obligations by, *inter alia*, failing to allow access to books and records with respect to the Defendant Business and/or Defendant BIMM and failing to provide requested disclosures with respect to the capitalization, income, assets and liabilities of the Defendant Business despite repeated inquiries and demands of Plaintiff – and have now cut off communications.

85. As a result of the aforementioned wrongful conduct, Plaintiff is entitled to an accounting and an inspection of books and records for the Defendant Business, Defendant BIMM,

and for Defendant CGM (to the extent applicable to the Defendant Business), for at least the period from 2018 to present. Plaintiff has no adequate remedy at law and cannot determine the amounts owing to him — including his share of the distributions, allocations and proceeds of the Defendant Business — without an accounting and an inspection of the books and records of the companies.

**FOURTH COUNT**
**Right to Inspect and Copy Books and Records**
**(Defendant BIMM and Defendant CGM)**

86. Plaintiff realleges each of the foregoing paragraphs of the Complaint.

87. As detailed above, Plaintiff entered into the Transaction under which he obtained an interest in the Defendant Business reflected in, *inter alia*, the Equity Interest in Defendant BIMM which operates the Defendant Business in partnership with Defendant CGM.

88. As detailed above, the Defendant Business operated through Defendant BIMM in conjunction with Defendant CGM under the complete dominion and control of Defendant Operators as managing members of the companies and operators of the Defendant Business.

89. In this capacity, Defendant Operators have a fiduciary duty of loyalty, good faith and fair dealing to the investors in the Defendant Business and members of the constituent companies through which it operates including Defendant CGM and Defendant BIMM.

90. Defendants Operators themselves and through Defendant CGM and Defendant BIMM have breached their obligations to Plaintiff as investor in the Defendant Business and member of Defendant BIMM by refusing to permit Plaintiff to inspect books and records of the Defendant Business or the constituent companies through which it operates.

91. Under applicable law, Plaintiff has common-law and statutory rights to inspect and copy books and records of the Defendant Business and its constituent companies both by virtue of, *inter alia*, the Equity Interest, his contractual rights to admission as a member of record of Defendant BIMM and to the inspection and audit rights promised to him as detailed above, and,

upon his admission, the rights of a member of Defendant BIMM, including through the membership interest held by Defendant BIMM in Defendant CGM. *See, e.g.*, 6 Del. C. § 18-305 (as to Defendant BIMM, a Delaware limited liability company); N.Y. LLC Law, § 1102(a)-(b) (as to Defendant CGM).

92. By reason of the foregoing refusal of Defendants to provide access to the aforementioned documents and information, Plaintiff has been damaged.

93. At a minimum, by reason of the foregoing, Plaintiff is entitled to review and copy of the books and records of Defendant BIMM and Defendant CGM including those enumerated in 6 Del. C. § 18-305 and section 1102(a)(1)-(5) of the New York LLC Law, as applicable, as well as financial statements of the companies for the last three (3) years, capitalization tables for the companies and the Defendant Business, as well as other books and records reflecting the assets, liabilities, interest holders, and income of the companies and the Defendant Business – together with the direct login access to the point-of-sale and financial reporting system of the Defendant Business that Defendant MC and Defendant ZC promised to Plaintiff as a term of his investment.

94. By reason of the foregoing, Defendant BIMM and Defendant CGM should be compelled to deliver the foregoing access and materials to Plaintiff, including ongoing login access to the point-of-sale and financial reporting system of the Defendant Business, together with applicable monetary damages, fees and costs awarded to Plaintiff.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, Plaintiff respectfully requests that this Court enter an order granting judgment in favor of Plaintiff and against Defendants including the following relief: (i) ordering an accounting from Defendants for the Defendant Business as well as Defendant BIMM and Defendant CGM from inception in 2018 to present; (ii) ordering Defendants to make available for inspection and copying the books and records of the Defendant Business as well as Defendant BIMM and Defendant CGM, and to provide Plaintiff with ongoing login access to the point-of-sale and financial reporting system of the Defendant Business as promised to him; (iii) monetary damages in an amount to be determined at trial but not less than $100,000 with applicable interest and costs associated including reasonable attorneys' fees; and (iv) such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 6, 2026

**MCCUE SUSSMANE ZAPFEL & COHEN P.C.**

By: ______________________

Scott L. Swanson
420 Lexington Avenue, Suite 2250
New York, New York 10170
212-931-5500
sswanson@mszpc.com
*Counsel for Plaintiff*